# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN A. DEWITT** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  3-06 CV-2028-P** |
| | § | |
| **COSTCO CORPORATION SYSTEM,** | § | |
| **d/b/a COSTCO WHOLESALE** | § | |
| **CORPORATION** | § | |
| **Defendant.** | § | |


## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


Respectfully submitted by,

GILLESPIE, ROZEN, WATSKY & JONES P.C.
3402 Oak Grove Avenue, Suite 200
Dallas, TX  75204
PHONE: (214) 720-2009
FAX: (214) 720-2291

James A. Jones (attorney-in-charge)
State Bar No. 10908300
jaj@grwlawfirm.com
Joseph H. Gillespie
State Bar No. 24036636
josephgillespie@grwlawfirm.com

*Attorneys for Plaintiff Karen DeWitt*

**TABLE OF CONTENTS**

I.      SUMMARY OF DEWITT'S CLAIMS AND ARGUMENTS . . . . . . . . . . . . . . . . . . . . . 1

II.     STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.      DeWitt is a Long Term Employee with an Excellent History Who Had
                Never Previously Been Accused or Suspected of Dishonesty or Theft . . . . . . . . 2

        2.      DeWitt Complains to Assistant Manager Urishima about Assistant Manager
                Steven Paiz's Workplace Discussion of his Masterbation Habits . . . . . . . . . . . . 4

        3.      DeWitt is the Only Employee that Complained of Sexual Harassment . . . . . . . . 4

        4.      Warehouse Manager Sherm Ryan Does not Start Investigation of
                DeWitt's Complaint Until Told to do so by Regional Manager
                Mario Omoss who is Angry with Ryan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        5.      Sherm Ryan Has a History of Being Dishonest and Unethical  . . . . . . . . . . . . . . 6

        6.      Steven Paiz has a History of Sexual Harassment, Temper,
                Laziness, and Jealousy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        7.      Sherm Ryan and Steven Paiz are Longtime Buddies with Other
                Male Friends in the Warehouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        8.      Steven Paiz is Moved to Another Warehouse as Part of Manager
                Move Around – Not as Discipline for his Sexual Harassment  . . . . . . . . . . . . . . 9

        9.      Alleged Guzman Complaint about DeWitt is Hearsay and
                Full of Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        10.     Costco has Zero Evidence of When the Alleged Investigation of
                DeWitt was Initiated by Loss Prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        11.     DeWitt Never Stole a Black Sweater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        12.     DeWitt Never Stole Any Eye Drops  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        13.     Loss Prevention Agent Rudy Ramos Shredded His Notes
                Regarding DeWitt and Sweater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        14.     Head Loss Prevention Agent Keith Paget Bullies DeWitt
                During Interrogation that is a Sham Investigation . . . . . . . . . . . . . . . . . . . . . . . 20

i

15.   There is Circumstantial Evidence that Paget Knew of DeWitt's Sexual
        Harassment Complaint Prior to the Interrogation.  There is Direct
        Evidence that he at least knew about it during the Interrogation . . . . . . . . . . . . 24

16.   Assistant Manager Nakhe Evans Shredded Her Handwritten
        Notes from Interrogation Session  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

17.   DeWitt Absolutely and Unequivocally Denies Stealing from Costco . . . . . . . . 25

18.   When Told about Unpaid Eye Drops, DeWitt Offers to Pay and
        Costco Says No  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

19.   There is Video Evidence that DeWitt Did Not Remove Sweater from Store  . . . 30

20.   DeWitt Tries Multiple Times to Contact Paget, Omoss, Ryan, and Zook
        During Her Three Day Suspension to Plead Her Innocence But
        None of the Return Her Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

21.   DeWitt told by Sherm Ryan During Termination Meeting
        "This would not have happened if I had not been on vacation"  . . . . . . . . . . . . 31

22.   Costco Has Handled Other Alleged Theft Terminations Differently  . . . . . . . . 32

23.   Costco Does Not Apply Its Policies Consistently -  "Zero Tolerance" Policy
        Applied Differently to Admitted Multiple Sexual Harassment Offender
        Steven Paiz when compared to "Zero Tolerance" Policy for Theft that is
        Applied to DeWitt who Denies Costco's False Allegations Against Her  . . . . . . 32

24.   Costco's Written Statement to the E.E.O.C. Contains Multiple False
        Statements and Defendant Has Shifted Its Story . . . . . . . . . . . . . . . . . . . . . . . . 34

III.   ARGUMENTS AND AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.   Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       1.   Traditional Burdens Under FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . 35

       2.   Effect of Reeves, Desert Palace, and Rachid on
             Summary Judgment in Employment Cases  . . . . . . . . . . . . . . . . . . . . . . . 36

B.   Summary Judgment is Inappropriate Under Traditional Direct or
       Circumstantial Evidence Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

       1.   Plaintiff Has Direct Evidence of Retaliation - Defendant's Employees
             Have Shredded Key Documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2.     DeWitt Easily Establishes Her Prima Facie Cases of Retaliation  . . . . . . 39

     a.     DeWitt's *Prima Facie* Case of Retaliation  . . . . . . . . . . . . . . . . 40

          i)     DeWitt Engaged in Protected Activity . . . . . . . . . . . . . . 41

          ii)     Costco Took a Action that a Reasonable Employee
                   Would Find Materially Adverse  . . . . . . . . . . . . . . . . . . . 42

          iii)    A Causal Connection Exists  . . . . . . . . . . . . . . . . . . . . . . 42

3.     Summary Judgment Should be Denied Because Plaintiff
        Establishes Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

**CASES**:

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 42

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 41

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Baker v. Am. Airlines, Inc.*, 430 F.3d 750 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Bauer v. Albermarle Corp.*, 169 F.3d 962 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Brunswick Corp. v. Vineberg*, 370 F.2d 605 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Bryant v. Aiken Reg'l Med. Ctr.s, Inc.*, 333 F.3d 536 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 42

*Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006) . . . . . . . . . . . . 40

*Dennison v. AT&T Corp.*, 1998 WL 873032, *4 (N.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . 43

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-38

*Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300 (5th Cir. 1990) . . . . . 36

*EEOC v. Romeo Cmt. Sch.*, 976 F.2d 985 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Evans v. City of Houston* 246 F.3d 344, 85 FEP 1419 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 43

*Findeisen v. North East Indep. Sch. Dist.*, 749 F.2d 234 (5th Cir. 1984)
  *cert. denied*, 471 U.S. 1125 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Fierros v. Tex. Dept. Of Health*, 274 F.3d 187 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 42

*Gregory v. Daly*, 243 F.3d 687 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Jerseritz v. Potter*, 282 F.3d 542 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 42

*Long v. Eastfield College*, 88 F.3d 300 at 305 n. 4 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 43

*Medina v. Ramsey Steel Co.*, 238 F.3d 674 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 42

*Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197 (11th Cir. 2001) . . . . . . . . . . . . . . . . . 42

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . 37, 41

*Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Russell v. Univ. of Tex.*, 234 Fed.Appx. 195 (5th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . 35-36, 39

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Seaman v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Shackleford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 40

*Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187 (11th Cir. 1985) . . . . . . . . . . . . . . . . 43

*Swanson v. General Servs. Admin.*, 110 F.3d 1180 (5th Cir. 1997),
 *cert. denied*, 522 U.S. 948 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Texas Department of Community Affairs v. Burdine*, 101 S.Ct. 1089 (1981) . . . . . . . . . . . 39-40

*Thornborough v. Colombus & Greenville R.R. Co.*, 760 F.2d 633 (5th Cir. 1985) . . . . . . . . . . 41

*Vick v. Tex. Employment Comm'n*, 514 F.2d 734 (5th Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Whitt v. Stephens County*, 529 F.3d 278 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**RULES**:

42 U.S.C. §2000e-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Local Rule 56.5 and 56.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**TREATISE**:

Wright & Miller § 299 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KAREN A. DEWITT** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  3-06 CV-2028-P** |
| | § | |
| **COSTCO CORPORATION SYSTEM,** | § | |
| **d/b/a COSTCO WHOLESALE** | § | |
| **CORPORATION** | § | |
| **Defendant.** | § | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE DISTRICT JUDGE JORGE A. SOLIS:

Pursuant to Local Rule 56.5 and 56.4, Karen A. DeWitt ("Plaintiff" or "DeWitt"), files this her Brief in Opposition to Defendant's Motion for Summary Judgment.

**I. SUMMARY OF DEWITT'S CLAIMS AND ARGUMENTS**

This is a relatively simple retaliation case involving a long term employee with an unblemished track record who made the mistake of complaining within the company about one of her managers making sexually harassing statements to her about his masturbation practices. Prior to her complaint, Ms. DeWitt had been a stellar employee.  After her complaint, she was terminated.

Defendant claims that DeWitt was terminated because she "admitted" to stealing a black sweater and a box of eye drops from Defendant.  This is false.  She never stole anything and she never, in a million years, admitted to stealing anything.  Plaintiff can easily establish a prima facie case of retaliation and pretext.  This is not a summary judgment appropriate case as there are multiple fact issues that preclude summary judgment that a jury must decide.

---

Some of the key items that preclude summary judgment:

- Defendant intentionally **shredded key relevant evidence**.

- Defendant's **sworn testimony conflicts with even their own witnesses**.

- Defendant's **story has shifted** throughout this litigation.

- Defendant **falsely claims it disciplined Paiz** for his sexual harassment by moving him to another store.

- Defendant **has no admissible evidence** of when the alleged investigation into DeWitt began.

- Defendant's **alleged investigation was a sham**, as Defendant's employee bullied and interrogated Plaintiff.

- Defendant's **outcome for DeWitt was predetermined**.  High level employees never returned DeWitt's multiple phone calls during her three day suspension wherein Costco was allegedly "investigating" the facts of her situation.

There are many other facts and arguments briefed below.  For all of the reasons stated in this response brief and found within the appendix materials, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment in its entirety and set this matter for trial before a jury of Plaintiff's peers.

## II. STATEMENT OF FACTS

**1.**    **DeWitt is a Long Term Employee with an Excellent History Who Had Never Previously Been Accused or Suspected of Dishonesty or Theft**

DeWitt was hired by Costco in 1993.  (DeWitt Declaration ¶28, App. 010)  DeWitt's final position with Costco before her termination was as a supervisor in the Photo Lab at the East Plano, Texas store.  She had been employed within the photo lab for approximately five years when terminated. (DeWitt Declaration ¶31, App. 010)   Prior to her termination, DeWitt performed in an exemplary manner and was promoted on a number of occasions.  (Ryan depo p.

109, App. 077)  DeWitt was not disciplined at any time prior to her termination. (DeWitt Declaration ¶30, App. 010)

DeWitt was terminated from Costco on September 19, 2005.  Prior to her termination, she loved working at Costco.  DeWitt's mother-in-law worked for Costco corporate as an executive assistant for twenty-five years in San Diego and DeWitt's husband was formerly employed by Costco in California.  DeWitt expected to work at Costco the rest of her life. DeWitt had great benefits and was well paid.  DeWitt's husband was fully employed while DeWitt was working at Costco and between the two (with no kids) they had plenty of money. DeWitt spent thousands of dollars at Costco and was a loyal customer.  DeWitt would never have stolen anything from Costco and did not steal anything from Costco. (DeWitt Declaration ¶28, App. 010)

DeWitt did not have any prior instances of suspected theft in her twelve to fourteen years with Costco.  (Ryan depo p. 92, App. 068, Paiz depo p. 21-22, App. 021-022)  Prior to Paiz leaving the east Plano store, nobody ever raised any concerns to him about Ms. DeWitt's behavior or activities and suspected theft.  (Paiz depo p. 65, App. 042)  Matthew Marts worked with Karen DeWitt in the photo lab and was supervised by DeWitt for approximately two years prior to DeWitt's termination.  (Marts depo pp. 5-6, App. 256)  DeWitt and Marts frequently went out to lunch together during work and DeWitt would pay for Mart's food because he could not afford it and she could.  (Marts depo pp. 6-7, App. 256)  During the two years of working with DeWitt, Marts never suspected DeWitt was stealing from Costco or not paying for merchandise.  (Marts depo p. 7, App. 256)

2.     **DeWitt Complains to Assistant Manager Urishima about Assistant Manager Steven Paiz's Workplace Discussion of his Masterbation Habits**

In May of 2004, DeWitt was part of a conversation in the workplace with her immediate supervisor, Steve Paiz, wherein Paiz made sexually harassing and discriminatory statements regarding Paiz.  Paiz told DeWitt that she had, "beefy legs but that he would still do her."  This comment was abusive and sexual harassment but DeWitt hoped it was a one-time thing and did not complain to a supervisor at that time. (DeWitt Declaration ¶32, App. 011)

In early August 2005, prior to August 19, 2005, DeWitt was again subjected to a sexually harassing and discriminatory conversation by Piaz, wherein Piaz discussed his practices of masturbation.  He did this in front of DeWitt and a co-worker, Beverly Waybright.  DeWitt was disgusted by the conversation and left. (DeWitt Declaration ¶33, App. 011)

DeWitt complained on or about August 19, 2005 to one of the assistant managers at the store, Randall Urishima and told him about the conversation by Paiz and how she felt it was sexually harassing and inappropriate in the workplace.  Urishima told DeWitt that he would have to report the complaint to the warehouse manager Sherm Ryan.  (DeWitt Declaration ¶34, App. 011)

Paiz admits his conversation with DeWitt about his masturbation was an inappropriate workplace conversation.  (Paiz depo p. 33, App. 032)  When asked whether he ever told Ms. DeWitt that, "her legs were beefy, but he would still do her," Paiz stated that he, "cannot deny" saying it, but did not "recall" saying it.  (Paiz depo pp. 36-37, App. 033-034)

3.     **DeWitt is the <u>Only</u> Employee that Complained of Sexual Harassment**

Costco alleges, and Regional Manager Mario Omoss swears, that the other employee subjected to Paiz's discussions regarding masturbation, Beverly Waybright, was not retaliated

against even though she complained just like DeWitt.  Specifically, Omoss states:

> Beverly Waybright is another Costco employee who, like Ms. DeWitt, also alleged that Mr. Paiz made inappropriate statements.  Ms. Waybright still works for Costco, and has not been subject to any disciplinary action or adverse employment decisions.  Ms. Waybright has never been accused of stealing Company property.

(Omoss declaration ¶16, Defendant's App. 117)  The problem with this statement, and Costco's statements and arguments in general, is that it is demonstrably false and further evidence of pretext.  Costco's own witnesses make the falsity of Omoss' statements and Costco's arguments obvious.  Paiz himself states:

> Q.     What do you recall from the first conversation with Mr. Ryan that you had about this issue with Ms. DeWitt and Ms. Wayright (sic)?
> A.     He informed me that they had – **that one of them had complained about a conversation that we had had that they felt was inappropriate.**
> …
> Q.     Did Mr. Ryan tell you who the two employes were that had had the conversation with you?
> A.     He told me, yes.
> Q.     So he told you it was Ms. Wayright (sic) and Ms. DeWitt?
> A.     Yes.
> Q.     **Did he tell you which one of them had complained?**
> A.     **Yes, he told me Karen had complained.**

(Paiz depo pp. 32-33, App. 031-032)  Sherm Ryan also contradict's Omoss' sworn statement:

> Q.     In talking with Mr. Urushima, did you get the sense that Ms. Waybright had complained of the conversation at all?
> A.     **No, not at all.  Just Karen DeWitt.**

(Ryan depo pp. 41-42, App. 057-058)

## 4.     Warehouse Manager Sherm Ryan Does not Start Investigation of DeWitt's Complaint Until Told to do so by Regional Manager Mario Omoss who is Angry with Ryan

After DeWitt complained to Urushima on August 19, 2005, Sherm Ryan did not get back to DeWitt for quite a while.  He finally talked with DeWitt on August 28, 2005.  DeWitt told Ryan what had happened and the comments made by Paiz. (DeWitt Declaration ¶35, App. 011)

Ryan admits that when he finally discussed the DeWitt/Paiz matter with Omoss, his supervisor, Omoss "was extremely aggravated" with him because Omoss felt Ryan should have called Omoss immediately upon hearing of the complaint by DeWitt.  (Ryan depo pp. 46-47, App. 061-062)

**5.      Sherm Ryan Has a History of Being Dishonest and Unethical**

Mario Omoss has known Sherm Ryan for approximately 14 years.  (Omoss depo p. 11, App. 102)  Omoss has performed several performance reviews of Sherm Ryan during his tenure with Costco.  (Omoss depo pp. 12-13, App. 103-104)  In September 2002, Omoss reviewed Ryan based on his personal observations and gave Ryan a rating of "3" for "meets expectations" with regard to the review statement "demonstrates Costco's values and ethics."  (Omoss depo pp. 13-15, Ex. 17, App. 104-106, 137-139)  In October 2004 however, Omoss again reviewed Ryan but gave him a "2" which means **"does not consistently meet expectations" for "demonstrates Costco's values and ethics."**  (Omoss depo pp. 17-18, Ex. 18, App. 108, 140-142)  This low rating for "values and ethics" was based upon Ryan's failure to communicate negative issues to Omoss and for **Ryan's romantic personal relationship with a subordinate while he was married to someone else**, which Omoss learned of through other employees and eventually confronted Ryan regarding.  (Omoss depo pp. 18-19, App. 109-110)  **Omoss admits that having a romantic relationship with a subordinate is against Costco policy.**  (Omoss depo p. 19, App. 110)  Another item that negatively effected Ryan's review by Omoss is that Sherm Ryan sold salvage TV's to employees which is **against Costco policy**.  (Omoss depo p. 21, App. 111)  On Ryan's 2004 review, Omoss wrote, "**Sherm had difficulty in meeting the level of integrity expected of a warehouse manager.**"  (Omoss depo pp. 25-26, Ex. 18, App. 112-113, 140-142)

During Ryan's 2005 review[1], also performed by Omoss, Ryan was *again* given a "2" for "does not consistently meet expectations" for the review statement "demonstrates Costco's value and ethics." (Omoss depo pp. 27-28, Ex. 19, App. 114-115, 143-146) On the final page of the 2005 review, Omoss states about Ryan:

> Sherm has made **<u>numerous poor decisions</u>** this year. Below are two of the most serious.
>
> **<u>He failed to conduct a formal sexual harassment investigation on his assistant manager, Steve Paiz, who is also a close long-term friend from Albuquerque.</u>** Upon my discovering the allegation of misconduct, I instructed Sherm to conduct a detailed investigation. The allegation was accurate and Steve Paiz's personnel file received documents outlining his misconduct. He was moved to another location, as well as placed on notice. (Any further occurrences will result in termination.) **<u>One of the employees that complained about Steve's behavior was terminated for theft a short time later and claimed it was retaliation for her whistle blowing.</u>**
>
> Sherm sent an employee for an unauthorized drug-screening test after another employee made an allegation that he was a distributor of narcotics.
>
> Action points that need to be addressed by Sherm to continue as Warehouse Manager:
>
> - Communication with his superiors
> - Partner in important decisions
> - **<u>Honesty</u>**
> - Focus on basic responsibilities of a Warehouse Manager
> - **<u>Avoiding placing the company at risk</u>**
> - Operations audit points

(Omoss depo pp. 31-36, 39, 41, Ex. 19, App. 116-121, 123, 124, 143-146) Regarding the bullet point, "honesty", Omoss stated that he placed that within this performance evaluation of Ryan because he, "**felt that he [Ryan] had been dishonest with me [Omoss].**" (Omoss depo p. 41, App. 124) Omoss stated that he put Randall Urishima in the east Plano store because he considers Urishima a, "very honest, transparent individual," and Omoss felt like he needed to have somebody in the east Plano store that Omoss knew would call him if there was any kind of

---

[1] This review covers the time period in which Ryan oversaw the termination of DeWitt after she complained of sexual harassment by Ryan's longtime friend Steve Paiz.

issue because Sherm Ryan and Steve Paiz were entrenched there pretty well.  (Omoss depo p. 51, App. 129)

**6.      Steven Paiz has a History of Sexual Harassment, Temper, Laziness, and Jealousy**

While in Albuquerque, Ryan disciplined Paiz with a written warning about an incident Paiz had with a co-worker who complained of sexual harassment and Paiz losing his temper. (Paiz deposition pp. 41, 43, 44 Ex. 1, App. 057, 059, 060, 046-047, Ryan depo pp. 26-29, App. 051-054)

Paiz is described by Nakhe Evans, who is now a warehouse manager, as an **extremely jealous and very lazy manager** and she did not agree with his management style.  (Evans depo. pp. 16-17, App. 274)  Evans understood that employees knew that Paiz was jealous of Evans and some employees did not like Paiz.  (Evans depo p. 19, App. 275)  Employees raised concerns to Evans that Paiz was lazy and did not help.  (Evans depo p. 20, App. 275)  Evans was also told that Paiz was jealous of Evan's promotion above Paiz by another manager, Tom Zion.  (Evans depo pp. 22-23, App. 276)  Evans also talked with other managers, Jesse Sanchez and Randal Urishima, about not being fond of Paiz and thinking that Paiz was a lazy manager.  (Evans depo pp. 75-76, Ex. 11, App. 289, 291)  An email from Jesse Sanchez  states of Paiz, "**the thought of adding him to the mix of good people I have here is frightening**."  (Evans depo pp. 76, Ex. 11, App. 289, 291)

Just prior to Mr. Piaz's transfer to the Lewisville store, Ron Wilson, another manager in the store, told DeWitt "someone opened there big fucking mouth telling a lie about Steve and now he has to be transferred because of it."  (DeWitt declaration ¶37, App. 011-012)  At his deposition, Wilson claimed to have never talked to DeWitt about the Paiz' move.  (Wilson depo pp. 8-9, 10, App. 263-265)  This a fact issue for the jury to decide.  This is evidence that

employees within the warehouse were upset that DeWitt had complained about Paiz.

**7.      Sherm Ryan and Steven Paiz are Longtime Buddies with Other Male Friends in the Warehouse**

Steven Paiz worked with Sherm Ryan for Costco in Albuquerque, New Mexico for ten years. (Paiz depo pp. 8, 9, 10, App. 018-020) Paiz and Ryan have been on a bowling team together in Plano, Texas outside of work.  (Paiz depo pp. 23-24, App. 023-024)  While at the East Plano store together, Paiz and Sherm Ryan and Randall Urishima, who were all Costco manager, went to lunch together at Hooter's restaurant on their motorcycles.[2]  (Paiz depo pp. 26-27, App. 025-026, Ryan depo pp. 59-60, App. 063-064)

Within the Plano store, there was frequently a plain-clothes loss prevention agent named Rudy Ramos.  DeWitt knew that Ramos was a loss prevention agent and it was common knowledge among the employees.  DeWitt talked with Ramos on several occasions and she had seen him talk to Paiz and Ryan on several occasions too. (DeWitt Declaration ¶38, App. 012)

**8.      Steven Paiz is Moved to Another Warehouse as Part of Manager Move Around – Not as Discipline for his Sexual Harassment**

Sometime after DeWitt's complaint regarding Paiz, Paiz happened to be relocated to another store as part of a manager move around.  Several other managers were shifted between stores at the same time.  DeWitt was never told by anyone at Costco that Paiz was being relocated as a form of discipline. (DeWitt Declaration ¶36, App. 011)

In fact, Near Paiz' last day at the east Plano store, there was a farewell gathering for Paiz in the manager's office and there was a cake for Paiz.  DeWitt walked into the manager's office and saw the cake that had Paiz' name on it and said something like, "farewell Steve and good

---

[2] Texas vice-president Mario Omoss states that managers going to Hooters on a lunch break does not violate company policy but thinks there would probably be "better places" to go to.  (Omoss depo pp. 44-45, App. 127-128)

luck at your new location."   The day DeWitt saw the cake was the same day Ron Wilson approached her and told her Paiz was leaving because someone had opened their fucking mouth and was spreading lies about Paiz.  When Wilson was talking to DeWitt, she saw two other managers looking at her, Carlos Guardado and Erik Ingerbretson.  It was clear to DeWitt that Paiz had complained to several store employees about DeWitt having complained about him. (DeWitt Declaration ¶37, App. 012)

Costco, through Mr. Omoss, swears under penalty of perjury that, "Costco disciplined Paiz by. . . transferring him to another location."  (Omoss declaration, Defendant's App. 116-17) This is a false statement that is directly contradicted by Paiz's testimony:

Q.      What is your understanding of why you transferred from east Plano to Southlake?
A.      It's common practice to move managers, assistants and warehouse managers, so I was told it was a rotation.
Q.      Who told you that?
A.      Sherm Ryan.
Q.      And do you remember how long before the actual move to Southlake you learned about the pending move?
**A.      About seven days.**
…
Q.      Did Mr. Ryan – did anyone besides Mr. Ryan tell you about this move before it actually happened?
A.      No.
Q.      And your transfer to the Southlake store, you kept the same title, assistant warehouse manager?
A.      Yes.
Q.      Did Mr. Ryan tell you in **<u>any way</u>** that the move was a **<u>disciplinary</u>** action for **<u>anything</u>**?
**A.      No.**
…
Q.      When you found out that you were transferring to the Southlake store, was that good news or bad news, or were you indifferent?
A.      Indifferent.
Q.      It was a lateral move to you?
A.      It was a lateral move, but I've always enjoyed going to new stores, being in different warehouses.
Q.      Throughout your time at Costco, you've always indicated to the company that you were willing to relocate in order to further your career?

A.     Yes.

…

Q.     Was there any reference to "we're going to move you out of the store because of this"?

A.     I was not told "because of this," no.

Q.     Was there any reference made to you that you were being moved out of the store so that you were not in the same store as Ms. DeWitt?

A.     I don't recall that being said, no.

…

Q.     I'll show you Exhibit 10.  This appears to be a note by Mr. Omoss.  Have you ever seen this document before?

A.     No, I have not.

Q.     At the top it says… "Steven Paiz, Mandatory move from east Plano to Southlake."  Do you ever recall anyone telling you that your move was a mandatory move?

A.     No.

(Paiz deposition pp. 28-30, 31, 39, 56-57, Ex. 10, App. 027-030, 040-041)  Paiz is not the only Costco witness that demonstrates that Omoss' sworn statement is untrue.  Sherm Ryan testified that Piaz had previously asked to be relocated and indicated that he was open to relocation because it is "absolutely" considered beneficial within Costco to move to another store in order to get more experience and work with different people.  (Ryan depo pp. 32-33, App. 055-056)  When Paiz and Ryan discussed Paiz' inappropriate workplace conversation of Paiz' masturbation practices with DeWitt, Paiz came away from the meeting without feeling that he was in trouble or being disciplined for that inappropriate conversation with DeWitt.  (Paiz depo p. 38, App. 035)

**9.     Alleged Guzman Complaint about DeWitt is Hearsay and Full of Problems**

Costco alleges in this litigation that the person that first made a complaint about DeWitt was an individual named Vanessa Guzman who DeWitt supervised in the photo department.  (Ryan depo pp. 92-93, App. 068-069)  **Costco has submitted no sworn testimony from Guzman and Costco has not had Guzman verify that the written statements attributed to**

**her are accurate or when they were made.**  This is significant because Costco knew Ms. Guzman was somebody who had previously made unfounded complaints about other co-workers.  (Ryan depo pp. 93-94, App. 069-070)

The items listed in Guzman's hearsay statements are easily shown as items purchased on Plaintiff's shopping history.  One such item in Guzman's hearsay note is a statement that DeWitt allegedly told Guzman that Rudy Ramos had bought DeWitt an orange backpack for her birthday.  (Ex. 21, App. 205-206)  When asked at his deposition whether he knew "one way or the other whether Ms. DeWitt purchased that backback" Ramos's response was, "That, I do not know sir.  Her business is her business in her area."  (Ramos depo p. 20, App. 152)  Ramos obviously was not "investigating" Guzman's ridiculous claims against DeWitt even if the statement involved *him*.  He admits that after the written complaints by Guzman he did not investigate the items mentioned or look them up on the company's purchase tracking system.  (Ramos depo pp. 17, 21, App. 151, 153)  Ramos did not even ask Guzman questions or have a conversation with her.  (Ramos depo pp. 21-22, App. 153-154)  Even if Guzman did make her false allegations prior to DeWitt's protected activity (which cannot be proven with admissible evidence), it is clear from Ramos' testimony that Costco was not conducting an investigation or in the process of thinking of terminating DeWitt because of Guzman's baseless claims.

**10.    Costco has Zero Evidence of When the Alleged Investigation of DeWitt was Initiated by Loss Prevention**

Besides Costco's incredible claim that DeWitt is an admitted thief, Costco's other big defense claim in this case is that their "investigation" into DeWitt began before her complaint of sexual harassment and therefore there cannot be retaliatory animus or timing in her termination.  Costco has **no admissible evidence** that supports this claim.  Mr. Ramos, the loss prevention

---

agent that Costco claims initiated the investigation into DeWitt at the behest of employee Vanessa Guzman, cannot remember when Guzman first came to DeWitt and mentioned any suspicions.  (Ramos depo p. 13, App. 149)  Even when shown the hearsay written statement allegedly created by Guzman that has a date on the top, <u>Ramos could still not remember or testify when he received the document</u>.  (Ramos depo p. 13, App. 149)  Put simply, Ramos cannot verify when he received the hearsay statement by Guzman.  In addition to not knowing or being able to testify when he first received any alleged complaints about DeWitt, Ramos cannot even remember (and therefore cannot testify regarding) when he first started surveillance of DeWitt.  (Ramos depo p. 16, App. 150)

Rudy Ramos is not the only key witness that cannot credibly testify about the date of the alleged investigation commencing.  Mario Omoss stated under oath that he too, "<u>did not recall the exact date</u>" he first heard anything about DeWitt being investigated for alleged theft.  (Omoss depo p. 57, App. 130)  He also stated under oath that he was, "not sure" how he learned of the alleged investigation.  (Omoss depo p. 57, App. 130)  He also stated multiple times under oath that there were allegations by "employees", plural, about DeWitt, which is demonstrably false, as the only allegation ever mentioned in this lawsuit is the flimsy and demonstrably false allegation of Vanessa Guzman.  (Omoss depo p. 57, 59-60, 65, App. 130-133)  In Mr. Omoss' summary judgment declaration, submitted under penalty of perjury, he *now* recalls vaguely that he first learned of the alleged investigation into DeWitt "in or around August 2005" and that he learned of this from "Keith Paget."  (Omoss declaration ¶115, Defendant's App. 115)  Omoss's sworn deposition and declaration statements are contradictory.  Even looking past the fact issues that arise when the alleged decision maker changes his sworn testimony, there is the amazing fact that Omoss' declaration only states that the investigation began "in or around August 2005."

This could mean anything.  It could mean July.  It could mean September.  It could mean August 31st.  And if for sure could mean later than the August 19, 2005 date that Omoss states being when he first learned of DeWitt's protected activity.  Because Omoss's testimony is impossibly vague, Defendant has not presented admissible summary judgment evidence that establishes that Costco's alleged investigation of DeWitt began prior to her protected activity of complaining of sexual harassment.

Paget first learned of the alleged complaint by Guzman about DeWitt via a phone call from Rudy Ramos.  (Paget depo pp. 17-18, App. 170-171)  Paget <u>does not recall</u> how much time had transpired between Ramos calling Paget and Guzman complaining to Ramos.  (Paget depo p. 18, App. 171)  Paget did not create any document or record that establishes when Ramos first called Paget about the DeWitt issue.  (Paget depo p. 20, App. 172)  Paget claims that he received Guzman's statements via fax from Ramos and there should be a copy that has a fax date at the top but the only copies produced by Costco in this litigation contain the date of 11/23/05, well after DeWitt's termination.  (Paget depo pp. 22-25, Ex. 21, App. 173-176, 205-206)

**11.    DeWitt Never Stole a Black Sweater**

On the Monday before her termination, DeWitt took a black sweater off the floor with the intent of paying for it by having a co-worker ring her up.  She did this just before the time of day when the store opens.  Before she could have a co-worker ring her up, the store opened for business and she had several customers come in that needed attention.  She placed the sweater on the counter in the photo lab that was out in the open and was a counter used by customers.  Assistant manager Nakhe Evans approached DeWitt to say hello and Evans mentioned that she was very cold.  Evans then went to the front register to assist a customer who was checking out because the store had just opened and had only one register open.  DeWitt took the sweater to

Evans and removed the tags so that she could have a co-worker ring up the sweater by using the tags and DeWitt handed the sweater to Evans and told her to use it.  DeWitt did not place it on Evans' shoulders, she actually handed it to her.  DeWitt went back to the photo lab to assist customers that were now waiting and DeWitt placed the tags on the online computer desk. (DeWitt Declaration ¶5, App. 033, Evans depo p. 27, App. 277)

Because DeWitt did not have the sweater and because she was busy with customers, she completely forgot about the sweater and the tags and the purchasing of the sweater.  DeWitt forgot to have a co-worker ring her up by using the tags.  This was an honest mistake.  DeWitt was not trying to steal the sweater. (DeWitt Declaration ¶6, App. 003)

DeWitt never left the store with the black sweater.  DeWitt frequently had a another black garment, a black jacket with a white stripe, that she tried to keep with her in the photo lab because she frequently got very cold.  In this litigation, for the first time, DeWitt was shown very bad pictures that appear to be snapshots of a video surveillance screen at Costco.  Mr. Paget, never showed DeWitt the video surveillance during his interrogation of DeWitt.  The screen shots of DeWitt near the store entrance have a black garment with a white stripe on the side of it. This is clearly the black "jacket" DeWitt has owned for a long time and not the black sweater Costco falsely accuses DeWitt of stealing.  DeWitt never left the store with the black sweater and it was in the photo lab at the time of DeWitt's termination.  During her deposition on August 30, 2007, DeWitt tendered to Costco her black "jacket" with the white stripe on it and it was marked as Exhibit 18 to her deposition and the jacket remains in the possession of Costco or Costco's counsel. (DeWitt Declaration ¶7, Deposition Ex. 18, App. 003-004, 015, 336)

On Monday or Tuesday, Keith Paget, a regional loss prevention agent called Evans and told her they were investigating DeWitt about a black sweater that DeWitt had given to Evans to

wear.  (Evans depo p. 23, App. 276)[3]  At the time of the phone call, Evans was wearing the sweater and told Paget that she was wearing the sweater.  (Evans depo p. 24, App. 277, Paget 58-60, App. 177-179)  Paget told Evans to either return the sweater to DeWitt or leave it in the office, so Evans left it her chair in the office.  (Evans depo pp. 24-25, App. 276)  When Evans came back the next day, the sweater was still on her chair in the office.  (Evans depo pp. 27-28, App. 277)  Later in the day, Evans did not see the sweater on her chair anymore and she asked DeWitt if DeWitt had gotten her sweater back and DeWitt replied, "yes, and any time you are cold, there are sweaters hanging over in the corner of the [photo] department, and you can borrow one."  (Evans depo p. 28, App. 277)  This was the same day that Paget arrived for his "investigation."  Even though DeWitt clearly believed she had paid for the sweater and was loaning it to her manager, Evans did not tell DeWitt in any way that the sweater was unpaid for and an "investigation" was under way.  (Evans depo pp. 28-29, App. 277)

On Wednesday after lunch, the same day she was terminated, DeWitt saw the sweater on a chair in the manager's office (where Evans left it at Paget's direction) and that was the first time DeWitt had thought of the sweater since handing it to Evans.  DeWitt assumed that Evans was done using it so she took it off the chair in the office and placed it on the counter in the photo department that is out in the open.  DeWitt had a cart of groceries between the optical department and the photo department and planned to purchase those items and the sweater after her shift ended for the day.  DeWitt was not attempting to steal the sweater nor did she want to steal the sweater.  DeWitt intended to purchase the sweater. (DeWitt Declaration ¶8, App. 004)

Just after that, Vanessa Guzman was called from the photo lab to the manager's office.

---

[3] Paget also called Sherm Ryan while Ryan was on vacation and told Ryan that he was investigating DeWitt.  (Evans depo p. 68, App. 287)

Guzman was in the manager's office about thirty minutes and when she came back DeWitt asked what was going on.  DeWitt was shaken up by having an employee that she supervised called to the office for thirty minutes.  DeWitt is slightly nervous by nature and has anxiety issues.  At the time that Vanessa Guzman was called to the office she began getting anxious and nervous because she did not know what was going on and she started trying to think about all of the things Vanessa had done in the recent past and DeWitt thought Guzman might be in trouble for something that happened while DeWitt was on vacation.  DeWitt was also on edge because of her recent complaint about Steven Paiz and the reaction she had seen to the complaint.  (DeWitt Declaration ¶9, App. 004)

Guzman told DeWitt that Nakhe Evans just wanted to tell her she was doing a good job.  That did not make sense to DeWitt because Nakhe had just started at the east Plano store that Monday.  Guzman told DeWitt that Evans wanted to talk to DeWitt in a few minutes.  DeWitt had never in her career been called to the manager's office for something that was not scheduled (like a performance evaluation) and DeWitt became very flustered at that point and highly anxious.  DeWitt was not even thinking about the sweater anymore and had completely forgotten about it.  The sweater remained on the counter out in the open in the department. (DeWitt Declaration ¶10, App. 005)

Before Evans came and got DeWitt, she began to have Beverly Waybright in the optical department, which is next to the photo department, ring up her groceries in the optical department.  Beverly always rang DeWitt up.  This was DeWitt's normal routine.  DeWitt was having Waybright ring her up because DeWitt was leaving early for the day as she had

previously planned with Ms. Evans because the store was slow that day.[4]  DeWitt began to have Beverly ring her up when Evans approached and told DeWitt to come to the office.  DeWitt had given Beverly a signed check and her member id number so Waybright could ring DeWitt up.  DeWitt went to the office before the purchase was done.  DeWitt still did not know what she was being called to the office about.   DeWitt was even more nervous by this time. (DeWitt Declaration ¶11, App. 005)

**12.     DeWitt Never Stole Any Eye Drops**

On Tuesday of the week DeWitt was suspended and later terminated, she had an eye infection and had been given a prescription by her doctor and was told to purchase a certain kind of eye drops available over the counter.  While at work, DeWitt provided her prescription to the pharmacy and asked for assistance in finding the eye drops because she could not find them.  Her prescription was not ready so she went back to the photo lab and returned when she thought her prescription was ready.   (DeWitt Declaration ¶12, App. 005)

DeWitt returned to the lab with the eye drops and handed the eye drops to the pharmacist who DeWitt thought rang her up for both items.  DeWitt had the pharmacist explain how many prescription eye drops she was supposed to use and she had the prescription out of the bag during her explanation.  The pharmacist placed the eye drops in the bag and stapled the receipt to the bag.  DeWitt has found her receipt for that transaction and it does not contain the eye drops.  The pharmacist must have failed to ring DeWitt up for the eye drops because she [the pharmacist] was explaining the prescription to DeWitt.   (DeWitt Declaration ¶13, App. 005-006)

When DeWitt purchased her eye prescription, she honestly thought she was rung up for

---

[4] It was slow at the store and DeWitt had asked Evans if she could go home early, which was not unusually for a slow day.  (Evans depo pp. 35-36, App. 279)  Evans did not think DeWitt was asking to leave early for the day because of any fear, guilt, or as an attempt to flee by DeWitt.  (Evans depo p. 36, App. 279)  In fact, DeWitt asked Evans if the two of them could go to lunch together.  (Evans depo p. 36, App. 279)

both items.  DeWitt used her debit card to purchase the items and was given ten dollars cash back.  DeWitt thought that she was using her flex credits that she had through Costco on the prescription so she was not thinking that the prescription was costing anything.  The eye drops were around 13 dollars because of a 3 dollar instant off rebate.  When the cashier ran DeWitt's debit card, all DeWitt saw on the screen was an amount of $14.39 which seemed right to her because she assumed that was the amount for the eye drops after tax.  At the register in the photo lab, DeWitt does not do cash back so she did not even think that $10 of the $14.39 was her cash back.  DeWitt did not study the receipt or her items when she made the transaction.  This was truly a routine and brainless transaction by DeWitt and she did not have any intention of stealing or not paying for everything.  DeWitt made an honest human mistake at a cash register, and so did the cashier, and DeWitt did not catch the mistake because she was not paying attention and she was not studying her items or the receipt. (DeWitt Declaration ¶14, App. 006)

**13.    Loss Prevention Agent Rudy Ramos Shredded His Notes Regarding DeWitt and Sweater**

Ramos testified that he takes notes when he performs surveillance on somebody and would have done so with Ms. DeWitt, but when nothing happens he rights down "nothing happened" and he has since "thrown away" the notes about DeWitt and would not have retained them, "unless there was specific detail in that note that would make [him] keep the notes." (Ramos depo p. 17, App. 151)  Therefore, if there were any notes that would have helped Costco's otherwise unsupported claim that their investigation of DeWitt began prior to her complaint of sexual harassment, Costco *destroyed* those notes.  Furthermore, from Ramos' description, the notes would have been evidence that "nothing happened" if he was investigating DeWitt prior to her  complaint of sexual harassment.

Ramos testified three times that he took handwritten notes regarding his surveillance and what he saw regarding the black sweater and that he produced those notes to Keith Paget by personally handing them to Paget.  (Ramos depo p. 27, 29-30, 35-36, App. 158-162)  After a deposition break, Mr. Ramos changed his story and claimed that his notes regarding the sweater were on a notepad but they were short and not detailed and he might have thrown them away.[5] (Ramos depo pp. 37, App. 163)  Defendant has not produced any notes from Ramos regarding what he allegedly saw when he claims DeWitt was steal a sweater from the company. Obviously, such notes would be highly relevant in this litigation (or any alleged theft incident) and there are no notes that support Ramos' claims regarding what he allegedly witnessed with the black sweater.  At the summary judgment level, the Court must infer that Ramos is either lying under oath about having taken hand written notes while allegedly watching DeWitt steal a black sweater or that he destroyed such notes or that Costco has withheld them in this litigation because they are unfavorable to Costco.

**14.   Head Loss Prevention Agent Keith Paget Bullies DeWitt During Interrogation that is a Sham Investigation**

When DeWitt went to the office with Evans, Evans closed the door and Keith Paget was behind the door.  DeWitt had never seen him before and did not know who he was.  This further worried DeWitt who was already nervous about being called to the manager's office for an unknown reason.  The first words out of Paget's mouth were, "do you know who I am?"  DeWitt responded no.  Paget said, "I am Keith Paget and I am the head of security for Costco."  DeWitt said okay.  Paget then said, "I am doing an investigation.  If you do not cooperate with me it

---

[5] While Plaintiff does not waive the jury argument that Ramos changed his testimony after a deposition break with counsel, this is <u>not</u> a suggestion to the Court that Costco's counsel suggested Ramos change his testimony.  But, Ramos *did* change his repeated testimony after a deposition break and the jury may make several inferences from that fact and at the summary judgment level, the Court must make all inferences in the non-movant's favor.

could mean your job." DeWitt was already on edge and this immediate intimidation made DeWitt even more anxious. (DeWitt Declaration ¶15, App. 006)

Paget did not tell DeWitt that she was under investigation, he just started asking DeWitt questions about random things in the photo lab and what she knew about items that had been taken into the lab. Paget did not show DeWitt any items at that point, he just had DeWitt guess at things and DeWitt did not know what Paget was trying to figure out, if anything. (DeWitt Declaration ¶16, App. 007)

Several times, when DeWitt would began to explain something, Paget would cut her off and insert his version of what he believed. He was clearly directing the conversation. This was not an open and cordial conversation by any means. At some point during the conversation Paget began accusing DeWitt of things and that was the first clue to DeWitt that she was under investigation. By that time, DeWitt was extremely flustered and nervous. DeWitt was not able to articulate her thoughts because Paget was randomly asking her questions in an accusatory manner. (DeWitt Declaration ¶17, App. 007)

During the interrogation by Paget, DeWitt attempted to explain what happened with the sweater and eye drops but Paget frequently cut her off. DeWitt never admitted theft and would never have admitted theft because she is not a thief. DeWitt explained to him that if she did anything wrong on the sweater and eye drops, it was truly and honest mistake and she must have done so because of her own stupidity. (DeWitt Declaration ¶18, App. 007)

The interrogation by Keith Paget was not pleasant. He was close to DeWitt's face at times. Paget used a loud voice at times. Paget was angry. He expressed disbelief in what DeWitt said. Paget was red in the face. DeWitt felt like she was being grilled and that Paget had predetermined that she had intentionally stolen from the company. At one point, Paget literally

got very close to DeWitt's face and said loudly, "I don't believe a word you are saying." DeWitt cried because of the way Paget was treating her. DeWitt was a nervous wreck. The interrogation was approximately an hour and a half to an hour and forty-five minutes. (DeWitt Declaration ¶19, App. 007)

At one point during the interrogation, DeWitt asked if she could call her husband. Paget said no. A few minutes later, Paget asked why DeWitt needed to call her husband and DeWitt told him she had dogs at home and she was going to be late and that she needed to tell somebody what was going on. Paget let DeWit call her husband but stood there as she made the call. DeWitt told her husband that she was going to be late and that she was being interrogated by Keith Paget and accused of stealing a backpack and a sweater. DeWitt told her husband to call his mom (who worked for Costco) and tell her what was going on because DeWitt wanted her to hear about this from them, not Costco. When DeWitt got off the phone, she was scolded by Paget who said that he had not accused DeWitt of theft and that she needed to not lie to her husband. He also told DeWitt that she did not, "need to call your mom because I know who she is." He was angry at DeWitt. DeWitt's mother-in-law was at the time, an executive assistant with Costco in their San Diego offices where Paget offices. (DeWitt Declaration ¶20, App. 007-008, Evans depo p. 49-53, App. 282-283)

During the interrogation by Paget, he asked DeWitt about items in the department. He did not have any of the items in front of DeWitt and she was going off of memory and prior to the interrogation DeWitt had no idea she was about to be quizzed on the items in the department. (DeWitt Declaration ¶21, App. 008) There is no rule at Costco that says you cannot have items that you have purchased in your department. (DeWitt Declaration ¶22, App. 008)

Paget did not show DeWitt any of the video surveillance during the interrogation. Paget

did not even mention the video surveillance tape.  (DeWitt Declaration ¶23, App. 008)  Paget never told DeWitt who her accuser was during the interrogation.  (DeWitt Declaration ¶24, App. 008)

Evans claims that Paget was very calm, never raised his voice, and never got red in the face during his interrogation of DeWitt.  (Evans depo pp. 42-43, App. 281)  This is not true.  Paget bullied DeWitt.  That the Company witnesses and DeWitt disagree on this key point, is a fact dispute.

During the interrogation, Paget never asked DeWitt to pay for the allegedly stolen eye drops or the sweater.  (Evans depo p. 58, App. 285)  Paget never showed DeWitt the over the counter medicines in the photo lab that Paget later showed to Matthew Marts.  (Evans depo p. 57-58, App. 284-285)  Paget did not secure the black sweater and show it to DeWitt during the interrogation even though the sweater was in the photo lab during the interrogation.  (Evans depo pp. 58-59, App. 285)

Paget claims he did not question Vanessa Guzman, the person who (according to Costco) allegedly started all of this by reporting suspicions about DeWitt to Rudy Ramos.  (Evans depo pp. 62-65, App. 286)  It is incredible that Paget's "investigation" did not involve talking to the person who allegedly complained about DeWitt and who allegedly started the investigation.

Despite the fact that Evans sat through the interrogation of DeWitt by Paget and then witnessed Paget talk to the witnesses after DeWitt was suspended, nobody within Costco asked Evans for her input in the decision to terminate or what she thought had happened.  (Evans depo p. 69, App. 287)

The sweater was hanging in the photo lab while Paget interrogated DeWitt and when she was suspended for three days and escorted out of the building but Paget did not have Ramos take

photos of the black sweater (like he did for other items in the department) and Paget does not know where the sweater is today.  (Paget depo pp. 90-91, App. 189-190)

Matthew Marts was directed by Paget to write a statement about items in the photo lab that were placed in front of him while Keith Paget watched him write the statement.  (Marts depo pp. 13-16, App. 257)  The conclusion of Marts statement does not accuse DeWitt of theft.  It states, "Truthfully I have no idea whether any of the items were actually purchased or not." (Marts depo pp. 15-16, Ex. 13, App. 257, 260)  During Marts interrogation by Paget, if asked, Marts told Paget that he did not believe DeWitt had stolen anything.  (Marts depo p. 22, App. 258)  Marts was not even questioned about the eye drops.  (Marts depo p. 23, App. 258)

**15.    There is Circumstantial Evidence that Paget Knew of DeWitt's Sexual Harassment Complaint Prior to the Interrogation.   There is Direct Evidence that he at least knew about it during the Interrogation**

During the interrogation, DeWitt told Nakhe Evans that she felt the allegation of theft was because she was being retaliated against because of her complaint about Steven Paiz. (Evans depo pp. 46-47, App. 282)  When Paget came back into the room Nakhe Evans told Paget that DeWitt felt the investigation was retaliation because of her complaint about Paiz and Paget did not say that it was not or say that he did not know what DeWitt was talking about.  (Evans depo p. 47, App. 282)  Paget was unfazed by Evans' statement about retaliation and mention of Paiz.  (Evans depo p. 47, App. 282)  Paget acted as if he already knew about the complaint DeWitt had made.  Based on DeWitt's personal observation of Paget's reaction to the mention of her complaint about Paiz and retaliation, DeWitt understood Paget knew about her protected activity.   Nothing Paget did or said indicated that he did not know prior to the interrogation. (DeWitt Declaration ¶25, App. 009)

Paget being unfazed by the reference to DeWitt's protected activity contradicts Omoss'

testify in his declaration that, "At no time did I inform any Loss Prevention personnel about Ms. Dewitt's complaint against Steven Paiz or the events surrounding it." (Omoss declaration ¶14, Costco App. 117)  Even if the Court determines that Omoss is telling the truth in that statement, which a jury may find otherwise, it is beside the point, because Paget knew of the complaint about Paiz during the interrogation of DeWitt and there is evidence that he knew of it beforehand because of the way he reacted to the statement during the interrogation.

**16.      Assistant Manager Nakhe Evans Shredded Her Handwritten Notes from Interrogation Session**

During the interrogation by Paget, Evans was present and took handwritten notes.  She later typed different notes of the meeting.  (Evans depo pp. 32-33, Ex. 16, App. 278, 292-294) Evans intentionally destroyed her handwritten notes by shredding them.  (Evans depo pp. 6-7, 33, App. 272, 278)

**17.      DeWitt Absolutely and Unequivocally Denies Stealing from Costco**

During the interrogation, Paget questioned DeWitt about the black sweater and DeWitt explained that she thought she had paid for the sweater, and if she did not it must have been a mistake or her own stupidity.  (Evans depo p. 39, App. 280)  During the interview, DeWitt repeated the statement that it must have been her own stupidity a few times.  (Evans depo pp. 39-40, App. 280)

Also during the interrogation by Paget, DeWitt referenced the fact that she had another black sweater that was also in the department and there might have been confusion because of that.  (Evans depo pp. 40-41, App. 280)  DeWitt swore during the interrogation that she never left the building with the black sweater and in fact, during the interrogation, the sweater was still in the photo department because it had never left the building.  (Evans depo p. 41, App. 280)

Norman Tabor provided a written statement to Costco but it does not support Costco's allegation that DeWitt stole anything from Costco.  (Ex. 25, App. 253)  Mr. Tabor's statement reads:

> I, Norman Tabor, work in member service at #664 east Plano location.  I remember checking out fellow employee Karen of the photo lab with a prescription and a bag with a receipt attached.  My shift that day was 12:15 til 8:45p.m. on Tuesday the 13th of September.  Norman Tabor 9-15-05

(Tabor depo pp. 4-5, Ex. 25, App. 248-249, 253).  In his deposition, Tabor recounted the alleged "investigation" by Keith Paget and Nakhe Evans and explained that neither Paget nor Evans asked him about a black sweater or eyedrops.  (Tabor depo pp. 6-7, App. 250-251)  He concluded his sworn testimony by saying:

> Q.    How long have you known Karen DeWitt?
> A.    Since I started with the company in 2000 of September.
> Q.    Have you been at the east Plano store the whole time?
> A.    Yes.  She was manager of the photo lab.
> Q.    Did you ever suspect Ms. DeWitt of having stolen anything?
> A.    **Absolutely not.**
> Q.    Do you have any knowledge of whether Ms. DeWitt stole anything or not from the Company?
> A.    No, none whatsoever.

(Tabor depo p. 7, App. 251)

Costco repeatedly claims in their motion and brief to this Court that DeWitt "admitted" stealing the eye drops.  This directly conflicts all evidence.  Evans states in her sworn testimony:

> Q.    So in this discussion about the eye drops, you remember Ms. DeWitt referring to having paid for a prescription with her debit card and getting cash back?
> A.    Right.
> Q.    And do you recall her explanation?
> A.    I think she said, you know, there must have been a mistake, I believe she said that, that **she thought she had paid for them**.

(Evans depo p. 53, App. 283)  Evans non-shredded typed notes from the interrogation state:

He again talked to her about the eye drops.  She said she thought she had paid for it.

Keith explained to her that her total purchase was less than the cost of the eye drops and wouldn't she notice that?  She said well she got cash back and she didn't look and just rand her card.  She broke down and cried and said she didn't understand and that it was her own stupidity.

(Evans depo Ex. 16, App. 292-294)  Regarding the sweater and the eye drops, DeWitt explained and even cried that she must have made a mistake and she never stole anything.   When questioned further on this point, Evans stated in her deposition:

>Q.     At any point – the official term that I've seen in this litigation for her termination was "proof of dishonesty or confession" or something to that effect. "Confession" is the word I've seen.  At any point do you believe that Ms. DeWitt confessed to stealing any items from Costco?
>
>A.     I don't – she never said, I stole the sweater but she never should showed proof that she paid for the sweater, so I don't know how else to answer that.
>
>Q.     Right.  But she never confessed to stealing the sweater, correct?
>
>A.     She never said, I stole the sweater.
>
>Q.     And the same for the eyedrops?
>
>A.     She said they were all, I guess, mistakes or stupidity is what she would say.
>
>Q.     Other than the sweater and the eye drops, at the time of her termination, do you have any understanding that Costco contends she stole or did not pay for or grazed any other items other than the sweater and the eye drops?
>
>Q.     To your knowledge?
>
>A.     Prior to the investigation?
>
>Q.     No, at the time of her termination.  What I'm trying to do is boil down the reason why she was terminated and your understanding of that.
>
>A.     I belive it was because of the sweater and the eye drops.
>
>Q.     An not anything else that you are aware of?
>
>A.     No, just those two things, those two items.
>
>Q.     And no one ever told you that she was being terminated for the other over-the-counter items that she had in the department or that were found after she was –
>
>A.     She was never asked about those things, so I didn't really – I guess my assumption would be that it wasn't for those items.  It was for what was in the statement.

(Evans depo pp. 72-73, App. 288)  Omoss admitted that he heard from Paget that DeWitt had stated during her interrogation by Paget that, "if she did not pay for the eye drops, it was a mistake." (Omoss depo p. 76, App. 134)  In Sherm Ryan's deposition, this point was again made clear:

Q.      Do you understand that Ms. DeWitt continues to contest the fact that she ever stole anything from the company?

A.      Yes.

Q.      Did Ms. DeWitt ever admit theft to you at any point?

A.      Not to me.

Q.      And did she – the termination documents say, "proof of confession."  Did she ever confess to you that she had stolen anything or been dishonest?

A.      Not to me.

(Ryan depo p. 106, App. 074)  In Paget's deposition, this again was made clear and it is worth

reading what Paget actually said during his deposition:

Q.      … Ms. DeWitt, in your conversation with her about the sweater… she told you that she had thought she had paid for the item and then you said, "Well, I've done a review of the purchase history and I can't find that you paid for that item;" is that right?

A.      Yes.

Q.      Did Ms. DeWitt tell you that if it wasn't paid for, it was in her own stupidity and she must have been mistaken and not paid for it but was going to?

A.      I think the next portion of the conversation dealt with where the tags were on the garment.

Q.      So did Ms. DeWitt tell you she took the tags off and set them next to the computer?

A.      Set them next to a register, I think.

Q.      **And that if she forgot to pay for the sweater, it was her own stupidity and she must have been mistaken and not paid for it but she was going to?**

A.      **Yes.**

Q.      **Did she say a few times in that conversation that it was her own stupidity or she must have been stupid?**

A.      **Something to that effect, yes.**

…

Q.      We're still talking about the interview with Ms. DeWitt that you did when you came to the East Plano store.  And **do you recall from that interview that Ms. DeWitt denied stealing the sweater?**

A.      **She did.**

Q.      **And she said if it wasn't paid for it was a mistake on her part?**

A.      **Yes.**

…

Q.      **She explained to you that she thought she paid for those [eye drops] with her debit card and got cash back or something like that?**

A.      **She was adamant she paid for it…**

…

Q.      **Did she ever in reference to the eye drops say it must have been her own stupidity, but she thought she paid for the eye drops?**

A.      **I think she used that not only with the eye drops but sweater too.   She mentioned that two or three times.**

…

Q.      Your report that we've talked about, Exhibit 24, **do you believe it contains a conclusion that Ms. DeWitt had stolen the sweater or stolen the eye drops?**  When I say "conclusion" you told me before that you didn't make conclusions, you just presented the facts to your superiors.  But now I'm asking if your report makes a conclusion or not.

A.      **I don't believe it does.**  I believe it presents both sides of the issue…

Q.      And in your investigation, was it Ms. DeWitt's position that she didn't pay for the sweater and the eye drops, that it was a mistake, that it was not intentionally done?

A.      That was her position, correct.

…

Q.      … Did you – in presenting the information to whoever you presented it to at the company, **did you tell them that you had found sufficient proof of theft to find a terminable violation of company policies?**

A.      I presented the facts and let them draw their own conclusions.

Q.      Okay.  So I think you are saying no.

A.      **No.**

Q.      Because that would have been a conclusion.

A.      Correct.

Q.      But you provided them the information and we've already talked about that.

A.      Yes.

Q.      And now just to be fair, was your personal opinion – or do you have a personal opinion?

A.      My personal opinion is, I believe Ms. DeWitt did take merchandise from Costco.

Q.      **Did you convey that personal opinion to any at Costco?**

A.      **That's not my job, no.**

Q.      **Right.  That is not your job, no, and you didn't?**

A.      **No, I didn't.**

(Paget depo pp. 67-68, 72-73, 79-80, 115-16, Ex. 24, 199-120, App. 180-183, 185-186, 195-196, 207-210)

## 18.      When Told about Unpaid Eye Drops, DeWitt Offers to Pay and Costco Says No

During the interrogation by Paget, when he showed DeWitt that the eye drops were not on her purchase history, DeWitt **offered to pay for them right there**.  Paget did not allow her to pay for them.  He said "no" and went on interrogating DeWitt.   (DeWitt Declaration ¶26, App. 009)

**19.    There is Video Evidence that DeWitt Did <u>Not</u> Remove Sweater from Store**

In this litigation, Defendant produced blotchy copies of the video tape stills from the closed circuit TV that allegedly show DeWitt taking the black sweater.  Not surprisingly, Defendant did not give this "evidence" to the Court in Costco's summary judgment materials as proof of DeWitt's alleged crime.  Even though the quality that Costco provided is bad, it is easy to determine that the black sweater DeWitt is shown with in the photos has a white stripe down the side and is the same "jacket" that she brought to her deposition in this case as proof that she did not steal any black sweater.  (DeWitt declaration Exhibit A, App. 015)  As referenced above, Paget did not even show DeWitt the video while he was interrogating her and if the tape had supported Costco's false reason for termination, it would have been exhibit 1 in Paget's interrogation and Defendants' summary judgment motion.

**20.    DeWitt Tries Multiple Times to Contact Paget, Omoss, Ryan, and Zook During Her Three Day Suspension to Plead Her Innocence But None of the Return Her Calls**

During the interrogation by Paget, DeWitt asked if she should talk to Dennis Zook or Mario Omoss within corporate.  Paget indicated that DeWitt needed to put whatever she had to say on a piece of paper that he was making her write at the moment.  Paget told DeWitt it would not be in her best interest to call them during the investigation.  Paget also told her that she could not speak to any of her employees during the investigation.  Paget said DeWitt could not call them and they could not call her.  DeWitt felt intimidated by Paget and his demeanor and could not possibly have explained what happened on the piece of paper she was being forced to write while being accused of theft.  (DeWitt Declaration ¶27, App. 009-010)

After DeWitt left the interrogation and was on a three day suspension.  DeWitt had her husband try to call her supervisor, Sherm Ryan several times.  Mr. DeWitt left three messages.

DeWitt was standing next to Mr. DeWitt when he made these calls.  Ryan never answered his phone and he never returned the DeWitt calls.  DeWitt and her husband also attempted to call Dennis Zook and Mario Omoss during her suspension.  The DeWitt's left messages for both of these high level executives (the purported decision makers in this case) but they never back. DeWitt also tried to call Keith Paget twice before her actual termination because Paget had given DeWitt his card.  Paget left messages on Paget's cell phone explaining she needed to talk to him and that she had further questions and needed a further opportunity to talk with him.  Paget never called DeWitt back. (DeWitt Declaration ¶27, App. 009-010)  Ryan admits that Mr. DeWitt called him two or three times and left messages asking Ryan to call him back.  (Ryan depo p. 106-108, App. 074-076)  Ryan also admits he did not return Mr. DeWitt's calls.  (Ryan depo p. 107, App. 075)

**21.    DeWitt told by Sherm Ryan During Termination Meeting "This would not have happened if I had not been on vacation."**

During her final termination meeting with Nakhe Evans and Sherm Ryan, DeWitt again expressed that she had not stolen anything from the company.  Sherm Ryan told DeWitt, "this [the termination] would not have happened if I [Sherm Ryan] had not been on vacation."  It was clear to DeWitt that Ryan knew DeWitt had not stolen anything.  Ryan became emotional during the termination meeting. His voice was shaky and his hand was trembling when he signed the termination papers.   His eyes watered up.   DeWitt cried during the termination meeting. (DeWitt Declaration ¶29, App. 010)  Nakhe Evans denies that DeWitt became emotional, denies that Ryan became emotional, and denies that Ryan said DeWitt's termination would not have happened if he had not been on vacation.  (Evans depo p. 70, App. 288)  These directly contrary sworn testimonies are further fact issues.

22.     **Costco Has Handled Other Alleged Theft Terminations Differently**

Ramos testified that he allegedly watched DeWitt take the allegedly stolen black sweater out of the store for thirty seconds to a minute before coming back in the store.  (Ramos depo pp. 24-26, App. 155-157)  He claims he watched all of this happen on closed circuit TV.  (Ramos depo pp. 25, App. 156)  Ramos admits he never (despite allegedly thinking that DeWitt was in the act of stealing from the company) went to DeWitt or her department and physically inspected the black sweater he claims she was stealing.  (Ramos depo pp. 26-27, 29, App. 155-159)  He also did not attempt to stop DeWitt while she was in possession of the eye drops or the black sweater.

This conflicts with how the company handled the real investigation of another employee that was actually suspected of theft in which Ramos watched the employee on closed circuit TV and had an assistant manager, Erik Ingerbretson, physically stop the employee as they exited the store so they could be caught in the act without question.  (Ingerbretson depo pp. 16-19, Ex. 15, App. 233-236, 238-245)

23.     **Costco Does Not Apply Its Policies Consistently - "Zero Tolerance" Policy Applied Differently to Admitted Multiple Sexual Harassment Offender Steven Paiz when compared to "Zero Tolerance" Policy for Theft that is Applied to DeWitt who Denies Costco's False Allegations Against Her**

Omoss created a handwritten undated note in this case that purports to be notes from a meeting he had with Paiz after Paiz transferred to the Southlake store.  (Ex. 10, App. 136)  In the note, Omoss states, "I told him his comments were very unprofessional and totally unacceptable. I informed him that any further comments of that nature to an employee would result in termination.  The only reason he was not terminated or demoted was his years of service and having no previous misconduct issues.  He understands Costco's zero tolerance policy on this

type of behavior." (Ex. 10, App. 136)  Omoss explained Costco's "zero tolerance" policy during

his deposition:

> Q.     Looking back at Exhibit 10, which is your handwritten notes from the meeting
>        with Mr. Paiz, you state that he understands Costco's zero tolerance policy on this
>        type of behavior.  Does Costco have a zero tolerance policy?
> A.     We call it a zero tolerance policy in regards to inappropriate comments or any
>        time of comments regarding sex or racism or, you know, gender, just anything,
>        ethnicity, color.  We just have zero tolerance.  Zero tolerance for him was he got
>        moved and he was in big trouble.  So if he did it **again**, it would absolutely be
>        zero tolerance in regards to his situation.

(Omoss deposition pp. 42-43, Ex. 10, App. 126-126, 136)  Obviously, "zero tolerance" if you are

buddies with the regional vice president and your manager actually does not mean "zero

tolerance" it means please do not do it "again" or you are in "big trouble" and you will get to

keep your same job and salary through a lateral transfer that you asked for anyway.  Again, this

is a fact issue as the jury can infer that Paiz was not punished and Costco's "zero tolerance" and

the written reprimand of Paiz by Omoss is nothing but pretext.

   Omoss attempted to make a distinction between the "zero tolerance" policy of Costco

that was supposedly applied to Paiz for his admitted sexual harassment and the "zero tolerance"

policy of Costco regarding theft by claiming theft has no "gray area." (Omoss depo pp. 43-44,

App. 126-127)  Upon further questioning he had to admit that too was not true:

> Q.     You would agree that there's a gray area if someone is accused of theft, and they
>        say they didn't steal anything, and there's no hard evidence of the theft?
> A.     If there's no hard evidence of the theft, I imagine there could be a gray area.  If
>        it's a "he said/she said" scenario, and there's no evidence of the theft, yes, if it's
>        one person saying that they stole and the other person saying they didn't.

(Omoss depo p. 44, App. 127)

24.     **Costco's Written Statement to the E.E.O.C. Contains Multiple False Statements and Defendant Has Shifted Its Story**

Ramos never talked to DeWitt about what happened with the black sweater or the eye drops.  (Ramos depo p. 38, App. 164)  Ramos never was asked by anyone from Costco what his opinion was about the sweater or the eye drops.  (Ramos depo p. 38, App. 164)  Regarding the items found in the photo lab after Plaintiff was suspended, Ramos admits there is no way for him to verify whether those items were items DeWitt had taken into the lab or whether other employees took them into the lab.  (Ramos depo pp. 39-40, App.165-166)

Paget admits that Costco's statement to the EEOC that Rudy Ramos witnessed DeWitt select a sweater from the sales floor and bring it to the photo lab is not accurate.  (Paget depo p. 118, Ex. 34, App. 198, 212-219)

Ryan stated during his deposition that he did not recommend the termination of DeWitt. (Ryan depo pp. 85, App. 066)  This directly conflicts with Costco's statement to the EEOC in response to DeWitt's charge of retaliation in which Costco told the EEOC, "after considering Paget's findings, Ryan recommended termination to the vice president, who made the final decision to terminate DeWitt's employment."  (Ryan depo p. 86, Ex. 34, App. 067, 212-219) Ryan talked with Costco's Brian Minish who put together the EEOC response and "gave him all the facts behind the case," prior to the response being filed.  (Ryan depo pp. 86, 102, App. 067, 073)  Ryan admits that he could have voiced a disagreement with Omoss about the termination of DeWitt but did not.  (Ryan depo pp. 98-99, App.071-072)

Paget does not draw final conclusions and his job and role within the company is to provide the facts on both sides and let the powers that be draw the conclusion.  (Paget depo p. 78, App. 184)  He "absolutely" does not make a recommendation on whether to terminate someone

or not for suspected theft and that is not his role.  (Paget depo pp. 110-11, App. 193-194)  In DeWitt's case, Paget did not opine one way or the other to his superiors whether DeWitt was telling the truth during his investigation.  (Paget depo p. 111, App. 194)

All of these things directly conflict with what Costco told the federal government in its response to Plaintiff's charge of retaliation.  A jury can infer that the ever shifting reasoning of the company, and the inability of any company witness to keep the same story as the other witnesses, is evidence that Defendants' stated reasons are false and pretextual.

## III. ARGUMENTS AND AUTHORITIES

### A.    Summary Judgment Standard

#### 1.    Traditional Burdens Under FED. R. CIV. P. 56

This case in not appropriate for summary judgment.  Summary judgment under FED. R. CIV. P. 56 is appropriate only where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  Rule 56 must be construed, in part, "with due regard for the rights of persons asserting claims adequately based in fact to have those claims and defenses tried to a jury."  *Celotex Corp. v. Catrett*, 477 U.S.  317, 327 (1986).  As the Fifth Circuit has stated, "summary judgment is a potent weapon, but 'courts must be mindful of its aims and targets and beware of overkill in its use.'"  *Findeisen v. North East Indep. Sch. Dist.*, 749 F.2d 234, 239 (5th Cir. 1984), *cert. denied*, 471 U.S. 1125 (1985) (quoting *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967)).

In ruling on Defendant's Motion, the Court **must** accept DeWitt's evidence as true and **must** draw all reasonable inferences in her favor.  *See Reeves v. Sanderson Plumbing Products,*

*Inc.*, 530 U.S. 133, 150 (2000)[1]; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Conversely, the Court must **not** weigh the evidence or make credibility determinations, for

"'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge.'"  *Reeves*, 530 U.S. at 150-51,

*quoting Anderson*, 477 U.S. at 255; *see also Dibidale of Louisiana, Inc. v. American Bank &

Trust Co.*, 916 F.2d 300, 307-08 (5th Cir. 1990) ("[c]redibility assessments are not fit grist for the

summary judgment mill"), *amended and reinstated*, 941 F.2d 308 (5th Cir. 1991).  Further, while

the Court must review the entire record as a whole, *Reeves* specifically instructs the Court to,

"disregard all evidence favorable to [Defendant] that the jury is not required to believe."  *Reeves*

states:

> Thus, although the court should review the record as a whole, **it must disregard all
> evidence favorable to the moving party that the jury is not required to believe**.  That
> is, the court **should give credence to the evidence favoring the nonmovant** as well as
> that 'evidence supporting the moving party that is uncontradicted and unimpeached, **at
> least to the extent that the evidence comes from disinterested witnesses**.'

*Reeves*, 530 U.S. at 151 (emphasis added), citing Wright & Miller § 299 and quoting *Anderson*,

477 U.S. at 300.

## 2. Effect of *Reeves, Desert Palace*, and *Rachid* on Summary Judgment in Employment Cases

The Supreme Court's unanimous opinions in *Reeves* and more recently in *Desert Palace,

Inc. v. Costa*, 539 U.S. 90 (2003) significantly impact the methods of proof and summary

judgment practice in employment cases.  These cases, and their predecessors, make clear that the

Fifth Circuit's former "pretext-plus" analysis is improper and should not be used.    Costco

---

[1]While *Reeves* involved a motion for judgment as a matter of law under FED. R. CIV. P. 50, *Reeves* made clear that
the same standards apply to summary judgment motions.  *Reeves* stated, "the standard for granting summary
judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same,'"
*quoting Anderson*, 477 U.S. 242 at 250-51.

ignores the holdings of these seminal cases by attempting to hold Plaintiff, at the summary judgment stage of this case, to an improper "pretext-plus" like burden.

In *Desert Palace*, the Supreme Court emphasized the power of circumstantial evidence by holding that a plaintiff can obtain a mixed-motive jury instruction on the basis of circumstantial evidence alone and that a plaintiff is not required to submit direct evidence of discrimination in order to obtain the instruction.   The Court explained the significance of "circumstantial" evidence in employment cases by stating:

> We have often acknowledged the utility of circumstantial evidence in discrimination cases.  For instance in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), we recognized that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of *circumstantial evidence* that is probative of intentional discrimination.'  *Id.* at 147.  The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted:  'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'  *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500 (1957).

*Desert Palace,* 539 U.S. at 99-100.

*Desert Palace* and *Reeves* also reaffirm the rule that discrimination may be inferred solely from a plaintiff's *prima facie* case and evidence that the employer's asserted reason for the employment decision is false.   *Reeves* states:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.   In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'   Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.   Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves*, at 530 U.S. at 147-48 (internal citations omitted).

The Fifth Circuit recently held that *Desert Palace* modifies the third step of the traditional *McDonnell Douglas* burden-shifting framework at the summary judgment stage in discrimination cases, stating in *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004) that the framework now involves the following:

(1)     *Prima Facie* Step: DeWitt must raise a genuine issue of material fact on her *prima facie* case of race discrimination and/or retaliation,

(2)     Legitimate Non-Discriminatory Reason Step: Defendant must then articulate, with admissible evidence, a specific legitimate, non-discriminatory reason for its actions, and, if (and only if) that burden of production is met,

(3)     Pretext and/or Mixed Motive Step: DeWitt must then offer sufficient evidence to create a genuine issue of material fact either (a) that Defendant's reason is not true or (b) that Defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is DeWitt's race or her protected activities.

See *Rachid*, 376 F.3d. at 312.  In this case, Plaintiff can easily establish her *prima facie* case of retaliation, and Plaintiff can easily show pretext.  For this reason, summary judgment is improper and Defendant's motion should be denied.

**B.     Summary Judgment is Inappropriate Under Traditional Direct or Circumstantial Evidence Analysis**

**1.     Plaintiff Has Direct Evidence of Retaliation - Defendant's Employees Have Shredded Key Documents**

Two key sets of document shave been intentionally destroyed by Defendant.  The first set of documents are the handwritten notes taken by Rudy Ramos regarding his observations of DeWitt.  The second set of documents were the handwritten notes taken by Nakhe Evans during the interrogation of DeWitt by Keith Paget.  Both sets of documents are likely to have contained

direct evidence of retaliation and the finder of fact, the jury, should be instructed regarding spoliation of evidence during the trial of this matter. Under the spoliation doctrine, a jury may draw an adverse inference "that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party." *Russell v. Univ. of Tex.,* 234 Fed.Appx. 195, 207 (5th Cir.2007); *see also Vick v. Tex. Employment Comm'n,* 514 F.2d 734, 737 (5th Cir.1975); *Whitt v. Stephens County*, 529 F.3d 278 (5th Cir. 2008). Plaintiff is entitled, at the summary judgment stage, to an inference that the shredded notes contained a negative reference regarding Plaintiff's protected activity or some other fact or facts that would establish her retaliation case. Without going any further, the Court can deny summary judgment by finding that the destruction of evidence creates a material fact issue that cannot be overcome at the summary judgment stage of this case and that summary judgment is inappropriate.

### 2.    DeWitt Easily Establishes Her Prima Facie Cases of Retaliation

If the Court does not find that Defendant's intentional shredding of key relevant documents is sufficient direct evidence to deny summary judgment, the Court must then analyze the summary judgment briefing through the familiar *McDonnell Douglas* burden shifting lens. The *prima facie* portion of the *McDonnell Douglas* framework serves the important function of "eliminat[ing] the most common nondiscriminatory reasons" for the employer's actions, e.g. for rejecting the plaintiff. *Burdine*, 450 U.S. at 254. Establishing DeWitt's *prima facie* case is not difficult, as DeWitt's burden is merely one of "production" not "persuasion." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Burdine*, 450 U.S. at 250; *Reeves*, 530 U.S. at 142. Once established, "the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's

evidence, and if the employer is silent in the face of the presumption, the Court must enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine*, 450 U.S. at 254; *see also Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978) (the prima facie case, "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.")

        **a.**      **DeWitt's *Prima Facie* Case of Retaliation**

To satisfy a *prima facie* case of retaliation, DeWitt must show by production, not persuasion, (1) she engaged in a protected activity, (2) Costco took action that a reasonable (employee/person) would find materially adverse, and (3) a causal connection exists between the protected activity and the adverse action. *Burlington Northern & Santa Fe Ry., Inc. V. White*, __ U.S.__, 126 S.Ct. 2405, 2415 (2006); *Shackleford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 407-08 (5th Cir. 1999). Costco does not, and cannot, dispute the first and second element of DeWitt's *prima facie* case, as (1) DeWitt complained to a supervisor about a sexually harassing and inappropriate conversation she was subjected to by her then manager, Steven Piaz, about his masturbation habits and (2) DeWitt was terminated soon after complaining of the sexual harassment and inappropriate comment. Plaintiff's complaint to her supervisor was clearly protected activity under both Title VII and the Texas Labor Code. Plaintiff's termination is obviously an action that a reasonable employee or person would find to be materially adverse. *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006). Instead, Defendant challenges Plaintiff's third *prima facie* element by arguing that DeWitt cannot show a causal connection between her protected activity and her termination.

Defendant's argument is not supported by the evidence and runs contrary to the established principle that the Court ***must*** view DeWitt's stated facts as true and correct and draw

all inferences in her favor as the non-movant.  *See Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 255.  Defendant also ignores and mischaracterizes the evidence.  Contrary to Defendant's arguments, DeWitt's evidence raises a genuine issue of fact on the third prong of her *prima facie* case.

DeWitt's burden at this point is not onerous, *Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999), and she need only make a "low showing" to shift the burden to Defendants. *See Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005).  Meeting the threshold of showing a prima facie case sufficient to survive summary judgment does not require a plaintiff to prove her prima facie case, only that she show the existence of evidence that raises a genuine issue of material fact concerning each contested element of her prima facie case.  *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989) (citing *Thornborough v. Colombus & Greenville R.R. Co.*, 760 F.2d 633, 640-41 (5th Cir. 1985)).  Once she makes this "low showing," an inference of discrimination arises.  *See Bauer*, 169 F.3d at 966.

### i)    DeWitt Engaged in Protected Activity

Even though Costco does not challenge that DeWitt can establish the first and second prongs of her prima facie case, it is important for the Court to view the evidence in its entirety rather than in a vacuum, as only then is the strength of Plaintiff's case understood and the clear pretextual nature of Costco's claimed defense exposed.

DeWitt verbally complained to her supervisor regarding the sexual harassment of her supervisor Steven Paiz.  She discussed this with both Randall Urishima and Sherm Ryan.  Sherm Ryan discussed the matter with his boss Mario Omoss and got in trouble for not having taken the proper investigatory response steps in a timely fashion.  Under any scenario, DeWitt clearly undertook protected activity and has presented a wealth of summary judgment evidence that

establishes that fact.  *See* 42 U.S.C. §2000e-3(a); *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002) (protected activity as contemplated by Title VII requires only that a plaintiff charge or oppose unlawful employment practices).  An employee's internal informal complaints of unlawful employment practices are sufficient to invoke the protections of Title VII.  *Fierros v. Tex. Dept. Of Health*, 274 F.3d 187, 194 (5th Cir. 2001)("filing of the internal discrimination complaint is a "protected activity" under Title VII).[4]

### ii)    Costco Took a Action that a Reasonable Employee Would Find Materially Adverse

After DeWitt's protected activity, Costco terminated the long time employee DeWitt after conducting a sham investigation and accusing her of "proof or confession" of dishonesty.  Under any analysis, the termination of DeWitt is a material adverse action and Costco cannot dispute that DeWitt meets the second prong of her *prima facie* retaliation case.

### iii)    A Causal Connection Exists

In arguing that DeWitt cannot establish a causal connection between her protected activity and her termination, Defendants incorrectly seem to be arguing that the Fifth Circuit "causal connection" step in the *prima facie* case requires a "but for" showing.  This is absolutely incorrect.  The "but for" standard is used for deciding the *ultimate* issue of causation, not the "causal link" prong of the prima facie case.  *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301(5th Cir. 1999).  The Fifth Circuit has specifically repudiated the "but for" inquiry at the *prima facie*

---

[4]Decisions from other circuits also hold that informal, internal complaints constitute protected activity.  *See Gregory v. Daly*, 243 F.3d 687, 700-01 (2nd Cir. 2001); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3rd Cir. 1996); *Bryant v. Aiken Reg'l Med. Ctr.s, Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003); *EEOC v. Romeo Cmt. Sch.*, 976 F.2d 985, 989 (6th Cir. 1992); *Jerseritz v. Potter*, 282 F.3d 542, 548 (8th Cir. 2002); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001); *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001).

stage, stating that "prong three of the prima facie case for retaliation is not as stringent as the "but for" standard." *Evans v. City of Houston* 246 F.3d 344, 354, 85 FEP 1419, 1426 (5th Cir. 2001) citing *Long v. Eastfield College*, 88 F.3d 300 at 305 n. 4 (5th Cir. 1996).

Given the easy, production not persuasion, requirement of Plaintiff's third prong of her prima facie case, it is clear that Plaintiff's direct evidence (even if Defendant argues the intentional shredding of evidence is not direct evidence) is sufficient evidence to establish the causal connection for Plaintiff's prima facie case.

Looking past the direct evidence, the *timing* of Defendant's adverse action and Plaintiff's protected activity is sufficient to establish this third prong. Prior to Plaintiff's protected activity of complaining of sexual harassment, Plaintiff had never been accused of any theft or dishonesty. Her career was and track record within the company were great. After her protected activity, she was fired. The Fifth Circuit has found that close timing between an employee's protected activity and an adverse employment action against her can establish the causal connection required for a *prima facie* case of retaliation. *See Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997), *cert. denied*, 522 U.S. 948 (1997). *See Medina v. Ramsey Steel Co.*, 238 F.3d 674, 685 (5th Cir. 2001) (finding causal connection established when supervisor who made decision to terminate employee knew of complaint before making the decision and suggesting that the causal link is established with proof that the complaint and the firing "are not wholly unrelated");[10] *see also Dennison v. AT&T Corp.*, 1998 WL 873032, *4 (N.D. Tex. 1998) (finding causal connection between complaint of discrimination and employee's termination

---

[10]*Medina* cites *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985) for the proposition that the "causal link" is satisfied when the employee shows that the employment decision and his protected activity "were not wholly unrelated." *Medina*, 238 F.3d at 684.

where the complaint was lodged a month before her discharge).  Here, there is clearly close timing sufficient to establish Plaintiff's *prima face* case.

Defendant has attempted to negate the amazing timing of Plaintiff's termination by arguing that the "investigation" into Plaintiff's suspected theft began before her complaint of sexual harassment.  Conveniently, Defendant has shredded the Ramos notes that would tell the jury when he actually began his surveillance of DeWitt.  The jury can infer the shredded notes would not have helped Costco or they would not have been intentionally destroyed.  Further, the notes by Guzman are inadmissible hearsay if offered for the truth of the matter asserted.  Defendant cannot rely on the hearsay date within the Guzman notes to determine when their alleged investigation began.  No witness of Defendant can testify as to when the investigation began.   The individual that actually was "investigating" DeWitt, Rudy Ramos, has no recollection of when his investigation began.  Furthermore, it is clear that the sham investigation did not really start until after Plaintiff's protected activity.

Taken one step further, the entire argument by Defendant that Costco began the investigation into suspected theft prior to DeWitt's termination is a red herring argument because the "investigators" Ramos and Paget, admit that they made no recommendations regarding termination and they did not even conclude that DeWitt had committed theft.  The decision makers, no matter who Costco shifts them to throughout the course of this litigation, Sherm Ryan or Mario Ramos, both had knowledge of Plaintiff's protected activity.  The decision to terminate, made by an individual that had knowledge of Plaintiff's protected activity, negates Defendant's claim that the decision was already in the works prior to the protected activity.

### 3.     Summary Judgment Should be Denied Because Plaintiff Establishes Pretext

This case is dripping in pretext and summary judgment should be denied in its entirety.

Because of the wealth of material fact issues, Plaintiff cannot recite *all* of the evidence of pretext here, but incorporates by reference Plaintiff's above statement of facts.  A short summary of the key evidence of pretext follows:

First, the shredding of key documents is sufficient evidence at the summary judgment level that Defendant's stated reason for Plaintiff's termination is false and pretextual.

Second, the heavy-handed and repeated false claim by Defendant that Plaintiff admitted to stealing items is contradicted by all of the evidence in this case.  Plaintiff has repeatedly cried out that she did not steal anything and she even offered to pay for the eye drops but was told no.  Every defense witness admits that Plaintiff has <u>always</u> proclaimed her innocence yet Costco's summary judgment argument (and sworn testimony) is that, "DeWitt had <u>admitted</u> to taking the sweater and the Thera Tears without paying for them and our computerizied records confirmed this misconduct."   (Omoss declaration Defendant's App. 115)   It would be one thing if Defendant's sworn testimony was that they did not believe Plaintiff.  Instead, Defendant's sworn testimony is that Plaintiff *admitted* theft.   This fact alone is incredible and evidences the pretextual nature of Plaintiff's termination.   Literally, Defendant's stated reason, that Plaintiff "admitted" to theft, is demonstrably false.

Third, the alleged "investigation" in this matter was clearly a sham.  First, there is a fact dispute as to how Paget behaved and what he said during the interrogation.  Defendant allegedly has incriminating video evidence but never showed it to Plaintiff during her interrogation or the Court in the summary judgment pleading.  Defendant has destroyed other evidence as discussed above.  Paget claims to not have even interviewed Guzman about what she saw or did not see.  The sweater was in the photo lab but Paget never secured the item and it is nowhere to be found today.  Ramos took photos of several suspicious items but never took a photo of the sweater.

Manager Evans was wearing the sweater when Paget first called to say he was on the way and rather than fix the situation by asking DeWitt what happened with the sweater right then Paget directed Evans to set up DeWitt by giving the sweater back or placing it on a chair. No witness statement take by Paget during his investigation shows that Plaintiff stole anything. It is clear that the sole purpose of the alleged investigation was to create a false reason to terminate a long term employee that had never done anything wrong other than recently complain about sexual harassment.

Next, there is Costco's amazing argument that Beverly Waybright is somehow evidence that Costco does not retaliate because Waybright complained too and she was not terminated. One would think that Costco would have abandoned this argument at the EEOC level after all witnesses in this case stated under oath that Waybright did not complain and the only person that complained was DeWitt. A jury is likely to infer that Costco's false statement that Waybright also complained of sexual harassment in order to further Costco's argument that it does not retaliate, is further evidence of pretext.

Next, there is the fact that Costco's story has shifted throughout this litigation. This has not been just a minor shift. Costco has changed who it claims was the decision maker in DeWitt's termination. Costco told the EEOC that Sherm Ryan was the decision maker that recommended termination. Now they claim that Mario Omoss was the individual that recommended termination, not Sherm Ryan and Ryan swears that he never makes termination recommendations and did not in this case. Another shift is the claim that Omoss (or Ryan) based his decision on the *recommendation* of termination by Paget. Paget admits he never made any such recommendation and he is not in the recommendation business, he just investigates and presents both sides. If that is true, he would have presented Ryan and Omoss the side that

DeWitt was repeatedly saying she did not steal anything and if something happened it was a mistake and stupidity and she offered to pay for that mistake.

Next, there is the sworn statement by Omoss that Ryan was moved to another store as discipline for his sexual harassment.  All signs, disputed and non-disputed state otherwise.  Paiz and Ryan both testify that the move was part of a manager move around and was not punishment.  If nobody told Paiz his move was discipline, and he in fact asked for such a move and enjoyed such a move, the jury is likely to infer that Omoss' post litigation claim that the move was discipline is false and pretextual, designed to cover up the fact that Paiz did something he admits was bad and was not punished whereas DeWitt did not do anything and she was terminated.

Next, Ryan's statement to DeWitt during the termination meeting that she would not be terminated if he had not been on vacation.  He cannot tell the jury that this statement (even if he disputes that he made it) was meant to convey that if he had been there and she had been caught stealing that it would have been okay.  No, his statement clearly is an admission by a party opponent that the stated reason is false.  If Ryan believed that DeWitt had done anything wrong, he would not have told her this.  This is evidence of pretext.

Next, the fact that DeWitt tried to call Ryan, Paget, Omoss, and Dennis Zook in order to plead her case during her three day suspension when they were "investigating", and *none* of them called her back (ever) is powerful evidence that these men did not want to hear her case and did not care what she had to say.  Their minds were made up.  There was no investigation.  What kind of company does not pick up the phone or return the call when an excellent long term employee is trying to call during a supposed "investigation" that could lead to that employee's termination.  This is not only evidence of pretext, this is evidence of *malice*.

## IV. CONCLUSION

WHEREFORE, for the reasons discussed above, substantial fact issues exist on DeWitt's retaliation claim, and DeWitt respectfully prays that this Court deny Defendants' Motion for Summary Judgment in its entirety.

                              Respectfully submitted by,

                              GILLESPIE, ROZEN, WATSKY and JONES P.C.
                              3402 Oak Grove Avenue, Suite 200
                              Dallas, TX  75204
                              PHONE: (214) 720-2009
                              FAX: (214) 720-2291

                              By:____/s/ Joseph H. Gillespie_____
                                    James A. Jones (attorney-in-charge)
                                    State Bar No. 10908300
                                    jaj@grwlawfirm.com
                                    Joseph H. Gillespie
                                    State Bar No. 24036636
                                    josephgillespie@grwlawfirm.com

                              *Attorneys for Plaintiff Karen DeWitt*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing has been served on this day, October 28, 2008, via the Court's ECF system, to all counsel of record.

                              By:____/s/ Joseph H. Gillespie_____